# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> STAFFMARK INVESTMENT LLC AND SONY ELECTRONICS, INC., <br><br> Defendants. | No. 12 CV 9628 <br> Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

Plaintiff Equal Employment Opportunity Commission ("EEOC") brought this lawsuit on behalf of Ms. Dorothy Shanks ("Shanks") against Defendants Staffmark Investment LLC ("Staffmark") and Sony Electronics ("Sony") for violations of the Americans with Disabilities Act ("ADA"). Plaintiff reached a settlement with Staffmark. Currently before the court is Defendant Sony's motion for summary judgment.

## I. STATEMENT OF FACTS

Plaintiff Dorothy Shanks, as a result of an amputation of her right leg in May 2008, suffers a walking impairment and has used a prosthetic leg at all relevant times. On May 27, 2010, Shanks applied for a temporary job at the Naperville office of Staffmark staffing agency.

On October 8, 2010, a Staffmark recruiter called Shanks with a temporary job opportunity at OHL, a logistics company, and notified her that she would be performing work on Sony televisions. Sony had hired OHL, which had contracted with Staffmark, to complete a time-sensitive "Re-Work Project." The project, led by three Sony employees, Qui Huynh, Esteban Gutierrez, and Gerardo Reyes, predominantly involved general laborers manually

1

checking individual television sets for stripped screws, repackaging the televisions into boxes, and labeling the boxes as either damaged or market ready. Huynh set up eight makeshift work tables for approximately five workers. Because the TVs were fragile, expensive, and heavy, the protocol dictated that two general laborers would pick up the TV out of the box and place it face down on the table, after which, a third laborer would unscrew and screw each screw to see if it was loose. In order to ensure the screw did not become stripped during the inspection process, the screws were to be inspected by placing the torque screwdriver perpendicular to the flat surface of the screw. Another two laborers would pick up the television, pack it, and label the box accordingly. The temporary employees were allowed to choose their own team and which of the tasks they performed on their team.

On October 9, 2010, Shanks arrived at the OHL building and reported to the Staffmark on-site supervisor, Ms. Tina Scott. At 3:00 p.m., Scott gathered the group, including Shanks, and escorted them through the security area and into the work area where two to three men were waiting. Huynh gave initial instructions regarding how to perform each task to the "original" crew of temporary workers and these workers then provided training to new temporary workers, including Shanks, on how to do their work. Plaintiff and Defendant dispute what direction was given to the laborers, in particular, whether the person checking screws needed to walk around the table to properly examine the screw. Each laborer, including Shanks, was entitled to three scheduled breaks per shift, which included two fifteen-minute breaks and a half-hour lunch.

Upon receiving instruction, the temporary employees chose their teams and tasks. Shanks was part of a team of six and was assigned to check screws. With a six-person team, two people were assigned to checking screws, one on each side of the television. Shanks performed her job

without walking around the table. Thereafter, Plaintiff and Defendant have widely divergent descriptions of what followed.

Defendant Sony claims that, within a half hour, Huynh noticed performance-related issues. Huynh went to her table and instructed Shanks to apply the screwdriver at a 90-degree angle to the screws. Huynh testified that after about an hour, he again noticed Shanks leaning across the table to reach the screws, partially sitting on the table, and not applying the screwdriver to the screws at a 90-degree angle, resulting in a stripped screw. Huynh instructed Shanks to walk around the makeshift table and apply the screwdriver at a 90-degree angle. Defendant claims that, after everyone returned from lunch, Reyes observed that Shanks was again "sitting on the pallet, making jokes, talking, making jokes, talking," and informed Huynh. Around 6:30 p.m., Huynh informed Gutierrez that he was concerned Shanks was not inspecting the screws properly and could damage the TVs, but did not make any recommendation to anybody that she be removed from working on the television project. Huynh testified that he noticed that Shanks had difficulty walking, and Reyes testified that he noticed that she had a "funny walk," but both contend that they did not think Shanks had a disability or that it would affect her ability to do the assigned work.

Plaintiff, on the other hand, claims that Shanks was not instructed to walk around the table to inspect the screws, but reached the screws from a secure, standing position as she was trained to do. Shanks did not sit, partially sit, or lean on the table. Shanks claims that no one complained about her work or asked her to perform her tasks differently on the first day. She completed her first day of work and accepted the offer to continue working on the project. Shanks returned on Monday, October 11, 2010 at 2:30 p.m. for her second shift at the OHL building. Shanks and the group of workers followed Scott to the time clock so that they could

"be on Sony's time" and were instructed to walk to the same work area from the previous day. At around 3:00 p.m., Shanks began work at the same station and rejoined her team, now consisting of five laborers. One of Shanks' team members was a woman named Tiffany Cole. Cole testified that she did not observe anyone criticize Shanks' job performance.

At approximately 4:30 p.m., Gutierrez spoke to Scott and requested Shanks' removal from the project. Cecilia Mota, described as a Hispanic woman from Staffmark, testified that she observed the interaction but was too far away to hear this conversation. Scott and Mota walked over to Shanks' table and informed her that she was removed from the Sony project but that Staffmark would place her on a different project. Shanks testified that only Mota approached her and asked Shanks to get her things. A co-worker inquired whether Shanks would be coming back. Mota responded that Shanks would not return because she was being taken off the line because of concerns that she would be bumped into or knocked down by someone. Shanks then said that she was fine and could perform the job. Shanks testified that Mota told her that Staffmark would find her a job where she could sit down and not get hurt, instructing Shanks to follow up with Tina Scott.

Shortly after being removed from the project, Shanks called Staffmark Account Manager Michelle Mugnaini at Staffmarks' Naperville office and requested show-up pay for Monday, October 11, 2010 and to be placed on another assignment. Staffmark compensated Shanks for four hours of "show-up" pay after she was released before completing a full day of work. An email sent shortly on October 25, 2010 indicates Mugnaini sent Vazquez an email requesting Shanks receive four hours of pay, ending the email to Vazquez with the following sentence: "[t]he next day they sent [Shanks] home due to her limping." On October 26, 2010, Vazquez sent an email to Jennifer Hart, a Staffmark employee, and copied Mugnaini, Scott, and Robin

4

Pritchett, stating, "[Shanks] should have been paid a total of 4hrs for 10/11/10 but was only paid for .50. She was sent home per customer's request."

On November 23, 2010, Shanks met with Charles E. Kolliker, the EEOC investigator assigned to her case, at the Agency's office. On January 5, 2011, Kolliker spoke with Shanks again, this time by telephone, and asked more details regarding Shanks' assignment with Sony and her subsequent discharge. Shanks and Kolliker mentioned Sony multiple times during the conversation in regards to her work, her duties, and her discharge. Shanks did not file a charge against Sony until March 5, 2012.

The degree of Shanks' walking impairment during relevant times is disputed. Dr. Padma Srigiriraju, Shanks' physician, testified that Shanks was not able to stand for eight hours without the use of a cane in October 2010, but could "take up a more active job" if she could use a "cane for support and intermittent rest breaks." Shanks testified that she was able to stand for eight or more hours, but, nonetheless, was not required to stand for eight hours without interruption.

## II. PRELIMINARY ISSUES

1. Admissibility of hearsay statements

As an initial matter, Defendant seeks to exclude as inadmissible statements of fact contained in paragraphs 2-4, 6, 8, 11, 14-17, 28-29, 31-39, as well as an email from Staffmark Account Managers Michelle Mugnaini and Sandra Vazquez. Defendant objects to the admission of paragraphs 2-4, 6, 8, 11, 14-16, 28, 29, 31, and 35-39 as disputed, mischaracterized, or contradictory to testimony given by witnesses. Because these objections go to the weight, not admissibility of these statements, I deem these paragraphs admitted.

a. Paragraph 17: Mota's statements regarding "concerns" about Shanks

Paragraph 17 contains a finding of fact based on Shanks' testimony that Mota told Shanks that she was being removed "because of concerns that Shanks would be bumped into or knocked down by someone." As Mota's statement was made out of court and is being offered for the truth, it is inadmissible hearsay unless it falls under an exception to the hearsay rule. Fed. R. Civ. P. 801. Plaintiff argues that the statement is admissible under Rule 801(d)(2)(D), which provides an exception for statements by an opposing party offered against itself that was made by the party's agent or employee on a matter within the scope and during the existence of that relationship. Plaintiff contends that Mota was an agent of Sony that made statements concerning Shanks' release that were within the scope of her employment. The issue is whether Mota's statements concerned a matter within the scope of her employment.

"[A] subordinate's [in this case, Shanks] account of an explanation of the supervisor's [Mota's] understanding regarding the criteria utilized by management in making decisions on hiring, firing, compensation, and the like is admissible against the employer, regardless of whether the declarant has any involvement in the challenged employment action." *Simple v. Walgreen Co.*, 511 F.3d 668, (7th Cir.2007) (citing *Marra v. Philadelphia Housing Authority,* 497 F.3d 286, 298 (3d Cir.2007)). Still, for an employee's statements to be admissible when the employee hasn't been personally involved in the disputed employment action, the employee's duties must encompass some responsibility related to decision-making process affecting the employment action. *Makowski v. SmithAmundsen*, 662 F.3d 818, 822-23 (7th Cir.2011). To that end, a statement by an agent is admissible as long as the agent had authority to make statements in a given area. *Nekolny v. Painter,* 653 F.2d 1164, 1171–72 (7th Cir.1981) (finding admissions where declarant was an "advisor" to the decision-maker,

participated in interviews, discussed employees' performance, and communicated news of termination).

In *Simple*, the district manager told the plaintiff's manager about factors that went into making his decision to promote a less experienced employee to store manager over plaintiff. Plaintiff's manager had worked with the other candidate and "supported" the district manager's assessment of the other candidate's work performance. The court found that the consultation with and subsequent approval by the plaintiff's manager was sufficient to show that plaintiff's manager was involved in the decision-making process affecting the employment action, therefore, making her statement an admission under Fed. R. Evid. 801(d)(2)(D).

Similarly, Sony evaluated Shanks and requested that Staffmark remove her from the project due to concerns regarding Shanks' safety. While Scott clearly testified that "if [the client] ask[s] you to do something, they're the client and you're to do it," Staffmark "approved" of Sony's evaluation and communicated the final decision to release Shanks from the Sony project. Sony Ex. 10, Scott Dep. 19:11-21:9; EEOC Ex. 7 Mugnaini Dep. 22:11-26:6). To that end, Mota's statement facilitated Staffmark's relationship with Sony and was made within the scope of her employment.

Alternatively, Plaintiff contends that Mota's statements are admissible for establishing Sony's existing state of mind, if not for the truth of the matter under Fed. R. Evid. 803(3). Rule 803 provides a limited exception for a statement to establish the *declarant's* then-existing state of mind—not proof of the recipient of the statement's state of mind. *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1265 (7th Cir. 1993), cert denied (proffered statement that plaintiff should "move back to Korea" was found to only reveal the brother in law's state of mind, not the state

of mind of the doctor who supposedly made the statement). Mota's statement can only establish Mota's state of mind, not Sony's.

      b.      Paragraphs 32, 33, and emails from Staffmark employees Mugnaini and Vazquez

Defendant also seeks to exclude paragraphs 32 and 33, containing statements from two Staffmark emails, and the corresponding Staffmark emails. Shortly after being removed from the project, Shanks called Mugnaini at Staffmarks' Naperville office and requested show-up pay for Monday, October 11, 2010 and to be placed on another assignment. On October 25, 2010, after receiving a call from Shanks, Mugnaini emailed Vazquez, who was in charge of payroll related to the televisions project and requested that Shanks be paid four hours show-up pay. Mugnaini ended the email to Vazquez with the following sentence: "[t]he next day they sent [Shanks] home due to her limping." On October 26, 2010, Vazquez sent an email to Jennifer Hart, a Staffmark employee, and copied Mugnaini, Scott, and Robin Pritchett, stating, "[Shanks] should have been paid a total of 4hrs for 10/11/10 but was only paid for .50. She was sent home per customer's request."

Defendants argue that both of these emails are inadmissible hearsay within hearsay, and that Mugnaini's statement cannot be admitted to show Vazquez's or Sony's state of mind. Although there is some dispute over what statements were made and to whom, Mugnaini and Vazquez's written statements may be admitted under Rule 803(5) as recorded recollections, even though they can no longer recall how they learned this information, because the records are (A) on matters Mugnaini and Vazquez once knew about but now cannot recall well enough to testify fully and accurately; (B) were made on October 25, 2010, after Mugnaini received a call from Shanks, and on October 26, 2010, shortly after the termination occurred, when the matter was

8

fresh in Mugnaini and Vazquez's respective memories; and (C) accurately reflects Mugnaini and Vazquez's knowledge.

    c.    Paragraph 34

Defendant seeks to exclude as inadmissible hearsay paragraph 34, which states "Vazquez told Mugnaini that some Staffmark employee was asked to release Dorothy because her leg issue, her limping was making it too slow walking from one end of the warehouse or to the other or coming back late from breaks or something..." Mugnaini testified that Vazquez informed her about Shanks being released from the Sony project because of Shanks' limping. Mugnaini's statement does not fall under any hearsay exception and will not be admitted.

    d.    James Shrader Declaration

James Shrader, Shanks' Prosthetist, stated in a signed declaration that it would have been extremely difficult for Shanks to walk at all because of her poor fitting prosthesis. Plaintiff contests Shrader's conclusions as to the fit of the prosthesis, as Shrader did not evaluate Shanks on the relevant date, the date of her release, and moves to strike Shrader's declaration on the grounds that it was obtained through *ex-parte* communications in violation of HIPAA and Shrader's professional code.

Shanks signed a release authorizing Defendant access to medical records and documents administered from October 2009 to October 2011 so it could prepare to depose Shrader. Defendant deposed Shrader on April 16, 2014, and later submitted, as part of its motion for summary judgment, a signed declaration from Shrader, dated April 23, 2014. Defendant did not serve a subpoena on Shrader, request or secure a court order, or secure a release from Shanks permitting Defendant to have additional communication with Shrader. While Defendant may not have been required to provide specific notice of an interview with Shrader, Defendant did not

make reasonable effort to inform Shanks that it would be contacting Shrader, her medical care provider, for an additional interview or to prepare and sign a declaration. *Palazzolo v. Mann*, 2009 WL 728527, at *4 (E.D. Mich. Mar. 19, 2009). As such, Defendant did not make a request under 45 C.F.R. § 164.512(e) that would permit it to conduct an *ex-parte* interview with Shrader. *Id*. at *3 (defendants may conduct ex parte oral interviews with plaintiffs' physicians if a qualified protective order consistent with 45 CFR 164.512(e)(1) is first put in place).

Defendant additionally argues that it was permitted to interview Shrader under the original release signed by Shanks. In keeping with HIPAA's goal of protecting privacy over medical information absent express consent of the patient, I interpret the language of the release narrowly in finding that the release authorized access only to "records," "notes," prescriptions," and other specified written documentation, not an oral interview of Shrader. I grant Plaintiff's motion to strike the declaration of James Shrader.

### III. LEGAL STANDARD

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir.2001). The Court's "function is not to weigh the evidence but merely to determine if there is a genuine issue for trial." *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir.2002).

Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts

demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d. 265 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir.2003)(citing *Lujan v. Nat'l Wildfire Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir.2000). I consider the record in the light most favorable to the nonmoving party, and draw all reasonable inferences in the non-moving party's favor. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir.2002).

## IV. DISCUSSION

1.  Disability Discrimination

To prevail on an ADA discrimination claim, the plaintiff bears the burden of showing that (1) she is disabled within the meaning of the ADAAA; (2) she is qualified to perform the essential functions of the job either with or without a reasonable accommodation; and (3) she suffered an adverse employment action on the basis of her disability. *Majors v. General Electric*, 714 F.3d 527 (7th Cir. 2013); *Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1172 (7th Cir. 2013). An individual proceeding on an ADA claim must demonstrate that a disability is the "but-for" cause of an adverse action, and a mixed-motive to terminate employment will not support a discrimination claim. *Serwatka v. Rockwell*, 2010 U.S. App. LEXIS 948, at *14 (7th Cir. 2009) (vacating a jury verdict based on a mixed-motive finding).

While a plaintiff may prove discrimination using either direct or indirect proof, the fundamental question at the summary judgment stage is whether a reasonable jury could find

11

prohibited discrimination. *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014). There is no dispute that Plaintiff suffered an adverse employment action, and the present inquiry is focused on whether Shanks is disabled under the meaning of the ADAAA and whether she is qualified to perform the essential functions of the job.

    a.    "Regarded As"

The ADAAA was amended in 2008 to "make it easier for people with disabilities to obtain protection under the ADA" and turn the focus to "whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." 29 C.F.R. § 1630.1(c)(4). The amended ADAAA redefines "disability" to provide expansive coverage to the maximum extent permitted by the terms of the ADA. *Id*. Under the ADAAA, an individual need not prove that the employer had knowledge of an actual disability if she can demonstrate that she was subjected to a prohibited adverse employment action because she was "regarded as" having an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to limit, a major life activity. 42 U.S.C. §§12102(1)(C); 12102(3)(A); *Jennings v. Dow Corning Corp.*, 2013 WL 1962333 (E.D. Mich. May 10, 2013)(employee that was not hired by employer because of employee's back and shoulder problems, regardless of whether believed to be substantially limiting, "regarded as" impaired).

An employer that believes an employee is unable to perform the job safely or that an employee's impairment is insufficiently controlled regards that employee as disabled. 29 C.F.R. Pt. § 1630.2, App. (explaining that an employer who terminates an employee because it believes the employee is a safety risk, has regarded the employee as disabled). While the "regarded as"

prong has been greatly expanded, an isolating remark made outside of the relevant decision-making context may not be evidence of discriminatory intent. *Risco v. John M. McHugh*, 868 F.Supp. 2d 75, 80 (S.D.N.Y. June 14, 2012).

Given the expanded scope of the ADAAA, Plaintiff does not need to establish that Defendant knew that Shanks was an amputee and, consequently, disabled. Both Reyes and Huynh noticed that Shanks walked in an irregular manner, stating that she walked with a "waddle" and by "swaying back and forth." Shanks was released from the Sony project employment due to safety concerns regarding her being bumped into or knocked down by someone. That Shanks' limping or waddling could have had any number of causes does not preclude Shanks from being "regarded as" having a walking impairment by Sony. There is sufficient evidence to create a factual dispute as to whether Huynh, Reyes, and Gutierrez regarded Shanks as having a physical impairment, and a reasonable jury could conclude that Sony regarded her as disabled.

    b.    Qualified to Perform Essential Services

The ADA only protects a "qualified individual with a disability." 29 C.F.R. app. § 1630.2(m). Under the ADA, a "qualified individual" is a person with a disability who is able to perform the essential function of the job either with or without a reasonable accommodation. 42 U.S.C. §12111(8). To determine the essential functions of a position, a court may consider, but is not limited to, evidence of the employer's judgment of a position, written job descriptions prepared before advertising or interviewing applicants for the job, the work experience of past incumbents of the job, and the work experience of current incumbents in similar jobs. *See* 29 C.F.R. § 1630.2(n)(3).

Huynh, Reyes, and Gutierrez all similarly described the tasks that Shanks was required to perform on the Sony project. They testified that the person who inspected the screws was required to apply the screwdriver at a 90-degree angle to the screw, stand and walk around the makeshift table the entire eight-hour shift. While Shanks conceded that she did not walk around the table to inspect the screws on the back of the televisions, she disputes that she was instructed during her training to do so. Shanks was trained by another laborer, not by Huynh, Reyes, or Gutierrez. Shanks claims that she performed inspection of the screws from one side of the table and was never instructed to change her performance of the task. Shanks acknowledges, however, that while she did not walk around the table to inspect the screws on her first day of work, there was an additional person on her team who was able to inspect the screws from the other side of the table. Based on her work performance, Shanks was invited to continue with the television project on the next work day. On the second day, while others on Shanks' work team who primarily performed other tasks also checked screws on the television when time permitted them, Shanks was the only temporary worker tasked with checking the screws.

While, generally, employers are allowed to determine the responsibilities and qualifications of a given position and courts "do not otherwise second-guess the employer's judgment in describing the essential requirements of the job," there appear to be no written job descriptions or other testimony to establish whether walking around the table to inspect screws was an essential function of the job. *Fry v. Sheahan*, 2009 U.S. Dist. LEXIS 70630, *13 (citing *Basith v. Cook County,* 241 F.3d 919, 928 (7th Cir. 2001)). Nevertheless, Shanks has admitted that standing eight hours a day, albeit with breaks, was an essential function of the position—a function that Defendants contend Shanks could not perform, with or without an accommodation, because she required a better fitting prosthesis and/or a cane.

14

Defendants point to testimony of Shanks' physician that in October 2010, Shanks could not stand for eight hours without the use of a cane. Shanks, however, contends that she was able to walk and work without a cane for eight to twelve hours a day at the time she was assigned to the Sony project. Shanks points out that she did, in fact, satisfactorily complete a full days' work on October 9, 2010 and, based on her work performance, was invited to return on Monday, October 11, 2010. In disputing medical reports and testimony about Shanks' prosthetics, Shanks points out that the reports and assessments took place from late in October 2010 and are not accurate reports of her ability on the relevant dates of employment. Plaintiff has presented evidence sufficient to raise a question of fact regarding both her ability to walk and stand at relevant times such that she was qualified to complete the essential services of the Sony project, as well as whether she did complete the essential services.

To the extent Defendant terminated Shanks because she was considered a direct threat that posed a significant risk of substantial harm to the health or safety of the individual or others, Defendant was required to eliminate or reduce the risk by reasonable accommodation. 29 C.F.R. Pt. § 1630.2(r). While the ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," under certain circumstances, "a plaintiff must normally request an accommodation before liability under the ADA attaches." 42 U.S.C. § 12112(b)(5)(A); 42 U.S.C. § 12112(b)(5)(A); *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 608 (7th Cir.2012). Sony contends that Shanks took deliberate steps to mask her actual disability, including wearing long pants and not using a cane, and that so, there was no evidence to show that Sony knew about or failed to reasonably accommodate her disability. Plaintiff concedes that she did not ask for a

15

reasonable accommodation and asserts that she did not require a reasonable accommodation as she could perform the essential duties of the position without one.

    c.        Similarly Situated Employees

Plaintiff argues that the testimony of Shanks' co-worker, Tiffany Cole, a similarly situated, non-disabled employee who was treated more favorably than Shanks, is evidence of discrimination under an indirect method of proof. Under an indirect method of proof, the EEOC must show that (1) [Shanks] is disabled under the ADA[AA]; (2) she was meeting her employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably. *Cloe v. City v. Indianapolis*, 712 F.3d 1171, 1182 (7th Cir.2013). The first three factors have been addressed, and I turn now to the fourth prong.

Plaintiff contends that Cole worked with Shanks inspecting the screws in the same manner and that, like Shanks, no one criticized Cole's performance. Cole testified that she did not observe anyone she believed to be a supervisor criticize Shanks' job performance and did not observe anyone try to get her to do a better job or to correct her job performance. Cole also testified that no one came to Cole's work station to correct the work of anyone on Shanks and Cole's team. Plaintiff contends that the only difference between Cole and Shanks is that Cole is non-disabled while Sony was aware that Shanks had a walking impairment, resulting in Shanks being removed from the project, while Cole stayed on the project. Defendant asserts that Shanks was removed from the project because she did not and also could not perform the essential functions of the job, as she was not a qualified individual for this position. Cole's testimony presents a question of fact regarding whether another similarly situated employee was treated more favorably than Shanks.

2. EEOC's Complaint is Not Time Barred

On July 19, 2013, I denied summary judgment in favor of Defendant on the issue of whether Shanks' charge against Sony—filed 511 days after her October 11, 2010 termination—is barred under § 706's 300-day limitations period. 42 U.S.C. § 2000e-5. I concluded that the EEOC and Shanks exercised reasonable diligence in investigating this case and timely filed charges against Sony when the information came to light in August 2011. I further found that Sony did not produce evidence to establish that Shanks had reason to believe that Sony employees were actively directing the activities of the Staffmark employees on the floor at OHL. Sony now presents Shanks' testimony that there were "big people" present on October 11, 2010. Shanks assumed they were people "higher" than Staffmark, but responds multiple times that she did not know where they were from. In being questioned where the new individuals in the room were from Shanks responds, "in my opinion, it was Sony." This testimony was taken on August 29, 2013, and does not indicate that Shanks knew or believed those individuals to be from Sony prior to August 2011.

Defendant has not presented any new or additional evidence to indicate that Shanks and EEOC failed to exercise reasonable diligence in investigating and filing charges against Sony and I, again, find that EEOC's Complaint is not time barred.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is denied in its entirety. There are numerous material issues of fact for determination by a jury at trial. Plaintiff's motion to strike the declaration of James Shrader is granted.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: September 4, 2014